UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| JEFFREY J. SPERAZZA | : | |
| Debtor | : | Bankruptcy No. 05-36416bif |
| _____ | | |
| JEFFREY J. SPERAZZA, | : | |
| Plaintiff | : | |
| v. | : | |
| EDUCATIONAL CREDIT | : | |
| MANAGEMENT CORPORATION and | | |
| UNIVERSITY OF MARYLAND | : | |
| Defendants | | Adversary No. 06-82 |
| _____ | | |

..................................................

OPINION

..................................................

In the above-captioned adversary proceeding, the plaintiff, Jeffrey J.

Sperazza, asserts that his student loan obligations should be discharged under chapter 7 as

they impose an undue hardship upon him pursuant to 11 U.S.C. § 523(a)(8). At bottom,

Mr. Sperazza contends that he has a learning disability that inhibits him from securing

and retaining gainful employment, maintaining a minimal standard of living, and repaying

his outstanding student loans.

1

Mr. Sperazza vigorously contends that he meets the three criteria established under In re Faish, 72 F.3d 298 (3d Cir. 1995), for demonstrating undue hardship.  He prosecuted his complaint pro se.

Defendant Educational Credit Management Corporation strongly opposes plaintiff's requested relief.  It maintains that Mr. Sperazza has been and could be gainfully employed if he so chose, can even afford, at present, to repay some of his student loans, has not revealed all of his income to taxing authorities, has not taken advantage of the Income Contingent Repayment Plan, and in general has not acted in good faith.

I.

After a one day trial, and upon consideration of the oral arguments made and memoranda filed by the parties, as well as all of the testimony and exhibits offered in evidence, I make the following factual findings.[1]

1.  On October 12, 2005, Mr. Sperazza filed a voluntary bankruptcy petition under chapter 7.  His petition disclosed that he resided at 88 Vermillion Drive, Levittown, PA 19054.  As of the time of trial, he still resided at that address.  N.T. at 2:13.

---

[1]No party ordered a transcript of the trial.  Therefore, all reference to the testimony ("N.T.")  shall include the precise time of day that the testimony was given on November 13th, as disclosed on the audio disc made of the trial.

2.  Defendant Educational Credit Management Corporation ("ECMC") is a

Minnesota non-profit corporation that acts as a designated student loan guaranty agency

pursuant to the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1077, et. seq.

ECMC took assignment from former defendant United Student Aid Funds, Inc. of almost

all of the outstanding educational loans that are at issue in this proceeding.  By order

dated September 1, 2006, ECMC was substituted as party defendant for United Student

Aid Funds, Inc.  See generally In re Bernal, 207 F.3d 595 (9th Cir. 2000).

3.  Defendant University of Maryland holds one outstanding student loan,

which Mr. Sperazza's schedules revealed had a current balance of $7,347.28.  Ex. D-2

(Schedule F).  This defendant did not appear in this proceeding; however, Mr. Sperazza

has not sought the entry of default, nor has default judgment been entered against this

party.

4.  At the time of trial, Mr. Sperazza was forty-two years old.  N.T. at 5:00.

Plaintiff has never been married, nor does he have any dependents.  N.T. at 5:00.  He was

the youngest of five children.  Ex. A-12.

5.  Mr. Sperazza graduated from Pennsbury High School in Fairless Hills,

Pennsylvania, in June 1982, ranked 777 out of 879 students, and with less than a C

average.  Id.; N.T. at 3:49.

6.  Upon graduation, Mr. Sperazza enrolled in Bucks County Community

College in the fall of 1982.  Ex. D-11.  Mr. Sperazza left community college after the

spring semester in 1984, without appearing to have earned any credits.  Ex. D-11.

7.  In November 1988, he enlisted in the Navy, but was quickly discharged on December 9, 1988, due to poor performance and his "failure to adapt to the naval environment."  Exs. A-12; A-15.

8.  In the fall of 1989, Mr. Sperazza returned to community college, where his performance greatly improved.  Ex. D-11.  He majored in American Studies and graduated with an Associate of Arts Degree in May 1991, with an overall B average.  Ex. D-11; N.T. at 3:50-3:51.

9.  After graduating from community college, Mr. Sperazza moved to the Washington, D.C. area and enrolled at the University of Maryland at College Park during its 1991 fall semester, receiving 47 credits for his previous community college studies.  Ex. A-2.  When Mr. Sperazza enrolled at University of Maryland he sought to earn a Bachelor of Arts degree in American Studies, N.T. at 2:14, and then gain admittance into a dual major graduate program for aspiring archivists in history and library science offered by the University of Maryland.  N.T. 2:15-16.

10.  Mr. Sperazza attended the University of Maryland through the 1995 spring semester, at which time he was academically dismissed from the university.  Exs. A-2; D-5, p. 15.  At the time of his dismissal, Mr. Sperazza had earned 98 credits and had slightly less than a C average.  Ex. A-2.

11.  Between May 1991 and May 1995, while attending the University of

Maryland, Mr. Sperazza received 20 federally-guaranteed educational loans, including

Stafford loans.  Ex. D-1.  At the time of his bankruptcy filing, ECMC asserts that his total

outstanding obligation on the assigned student loans was approximately $66,928.00.  Ex.

D-1.

12.  Mr. Sperazza has been evicted twice from rental properties in the past

seven years, most recently in August 2005.  N.T. at 2:43.  After that latest eviction, Mr.

Sperazza relocated from Washington, D.C. to Levittown, Pennsylvania, where he now

resides with his parents.  N.T. at 4:23.  His parents own a two-story, four bedroom house,

and Mr. Sperazza has his own room and full use of the residence.  N.T. at 4:24.

13.  Although Mr. Sperazza would prefer to live on his own,  Ex. D-14,

there was no evidence presented that his parents have asked him to leave or set any

deadline for him to do so.

14.  Mr. Sperazza listed on his bankruptcy schedules total monthly expenses

of $125, itemized as follows: $35 for clothing; $65 for transportation; and $25 in

settlement with the IRS.  Ex. D-2 (Schedule J); N.T. at 4:31.

15.  Since he began living with his parents, Mr. Sperazza occasionally pays

for his own meals, but most of his meals are provided by his parents.  Ex. D-14.  He also

pays for maintenance and insurance on a used vehicle he purchased for $400 in April

2006.  Ex. D-14.  His annual car insurance premium is $482, which he pays in six

monthly installments.  Ex. D-14.

16. Mr. Sperazza presently does not pay for rent or utilities, including telephone charges (although he sometimes uses a prepaid telephone card). Ex. D-14. He does incur costs for traveling to and from medical studies (to be discussed below). And, as will also be mentioned, he (at his discretion) gives his parents a portion of his medical studies earnings.

17. In connection with this litigation, Mr. Sperazza provided a document describing his employment history between February 1996 and January 2006. Ex. D-10. This employment history reveals nine jobs, one of which was with a staffing agency where he was assigned to three different employers for short term engagements. Id. At certain times within this ten-year period, Mr. Sperazza held more than one job. Id.

18. From April 1996 until May 1997, and from April 1999 until April 2000, Mr. Sperazza worked for Crown Books. Exs. D-5 at 27-28; D-10.[2] Plaintiff was engaged as a sales associate; his responsibilities primarily consisted of shelving books and operating the cash register. Id. Mr. Sperazza earned a salary of $11,000/year. Id. Although Mr. Sperazza left Crown Books voluntarily in May 1997, his employment was terminated during his second stint there in April 2000. Ex. D-5 at 30-31. Mr. Sperazza recalls that Crown ended his employment because he often made incorrect change for the customers, which resulted in his register not balancing at the end of his shift. Id. He also

---

[2]Exhibit D-10 states that his first engagement at Crown Books lasted only one month, until May 1996. At his deposition, he stated that this information was incorrect, and he worked at Crown until May 1997.

recalled, though, that he had no difficulty in assisting bookstore customers.  Id.

19.  Mr. Sperazza worked for an entity known as LSSI from August 1996

until January 1997.  Ex. D-10.  He was a key entry operator, id., and was involved in

establishing a new library database.  Ex. D-5 at 25.  Mr. Sperazza described his duties at

LSSI as "scanning bar-coded printouts of bibliographic records with matching bar-coded

volumes."  Ex. D-10.  He also stated that this job "[r]equired data entry, bibliographic

searching, analysis of complicated serials, and bibliographic transliteration."  Id.  Mr.

Sperazza earned a salary equivalent to $19,760/year.  Id.  He believes he voluntarily left

his employment with LSSI.  Ex. D-5 at 26.

20.  From June 1997 until the end of October 1997, Mr. Sperazza worked at

the Meet Market Café in Washington, D.C.  Ex. D-5 at 27-29.  There he worked in the

kitchen and also served customers.  Ex. D-10.  Mr. Sperazza worked approximately thirty

hours per week,  Ex. D-5 at 28, and earned a salary of $11,000/year until the cafe closed.

Id.; Ex. D-10.

21.  For a period in 1998, Mr. Sperazza worked for West Coast Video in

Fairless Hills, PA.  Exs. D-5 at 29; D-10.  He was a sales associate and was required to

operate the cash register.  Ex. D-10.  Plaintiff earned $11,500/year, id., until he left this

employment in November 1998 for reasons he could not recall.  Ex. D-5 at 29.

22.  In December of 1998, Mr. Sperazza held a seasonal position at an Old

Navy clothing store in Langhorne, PA.  Id.  There he folded clothes and assisted

customers.  Ex. D-10.  He earned the equivalent of $11,500/year.  Id.

23.  From April 1999 through September 1999, Mr. Sperazza worked at the

Firehook Bakery in Washington, D.C.  Ex. D-10.  Mr. Sperazza operated an espresso bar

at the bakery.  Id.  He earned $11,500/year from this employment.  Id.  This job was not a

full-time position and Mr. Sperazza apparently also worked at Crown Books during this

time period.  Ex. D-10.

24.  Mr. Sperazza also held a temporary position with the Smithsonian

Institution, National Museum of African Art, from August 1999 until February 2000.  Id.

Mr. Sperazza was engaged as an archives technician.  Ex. D-10.  His duties involved

entering photo data for color transparencies and black and white negatives of art objects

into a local database.  Id.  He would then take the forms with the appropriate images to

another department for scanning.  Id.  He also re-housed the images into sleeves and

envelopes and then re-labeled them.  Id.  Mr. Sperazza earned the equivalent of

$22,646/year while at this job.  Id.  It was a temporary position requiring about 800 hours

of work, which Mr. Sperazza satisfactorily completed.  Id.

25.  After his work at the Smithsonian Institute, Mr. Sperazza worked at

InfoCurrent, a temporary staffing agency located in Washington, D.C.  Id.  His first

assignment began on July 17, 2000 and lasted until November 30th of that year.  Id.  Mr.

Sperazza worked as an archives technician at the Export-Import Bank of the United

States.  Id.  There he "catalogued manuscripts using MARC format in conjunction with

AACR2 rules, transferred archival material to acid-free folders and cases, labeled them, and assisted in creating an archival finding aid." Id.  Mr. Sperazza earned $22,880/year while on this temporary assignment.  Id.

26.  Mr. Sperazza's next assignment while at the InfoCurrent agency was with the Daughters of the American Revolution ("DAR"), between February 16, 2001 and March 23, 2001.  Ex. D-10.  Mr. Sperazza was a record-copy assistant; he assisted the registration office with responses to letters requesting copies of DAR membership applications.  Id.  This position paid the equivalent of $20,000/year.  Id.

27.  His third and final assignment with InfoCurrent was with the Trademark Law Library, from April 23, 2001 until October 13, 2001.  Ex. D-10.  While so employed, he served as a library technician, a position that paid $28,000/year.  Id.  His responsibilities included responding to oral and written requests from trademark examiners and conducting research to determine whether a certain term could be used as a trademark.  Id.  He was occasionally assigned to small projects and performed basic clerical duties such as filing, shelving, and labeling materials.  Id.

28.  On October 16, 2001 Mr. Sperazza began full-time employment at ASRC Aerospace Corporation.  Ex. D-10.  He worked there until March 14, 2003.  Id. He was employed as a library technician.  Id.  Mr. Sperazza "[s]earched for foreign and U.S. patents, journal articles, technical information disclosures, books, publication and copyright dates, and other technical information using various commercial databases and

the Internet." Id.  He was also responsible for the manual or electronic retrieval of that

information.  Id.  Mr. Sperazza instructed patent examiners on scanning documents,

searching and retrieving information on the computers, and using the photocopier.  Id.  In

addition to these tasks, he had other administrative duties and worked on special projects

as needed.  Id.

29.  While at ASRC, Mr. Sperazza earned a salary of $32,000/year.  Ex. D-

10.  He was granted a 10% pay increase in November of 2002.  Id.  Mr. Sperazza testified

that this raise in pay was not merit-based.  N.T. at 4:03.  While employed at ASRC, Mr.

Sperazza contributed about $2,240 to a retirement plan, which he appears to have later

withdrawn.  Ex. D-12.  Mr. Sperazza was eventually terminated from this position.  N.T.

at 2:32; Ex. D-5 at 38.  At least two individuals who worked with him were willing to

serve as references for future job inquiries.  Ex. D-18.  Mr. Sperazza stated that his

termination may have been based upon job performance.  Ex. D-5 at 39.

30.  Mr. Sperazza has not been employed since he left ASRC in 2003.  N.T.

at 2:40.  While Mr. Sperazza claims that he submitted job applications to various

employers, he has not secured any type of employment, whether it be full-time, part-time,

or temporary.  N.T. at 2:40; 4:58-4:59.  However, he has not sought employment since the

date of his bankruptcy filing, October 12, 2005.  N.T. at 5:08.  Mr. Sperazza testified that

he believed he needed to devote all of his time to prepare for and then litigate the

dischargeability of his student loans.  N.T. at 2:41-2:42; Ex. D-5 at 63-64.  Indeed, he

wrote in June 2006 in connection with ECMC's discovery efforts:

> It should be noted that ever since the time that I filed a
> petition, or shortly thereafter, I have been devoting an
> increasing amount of time and effort in trying to have my
> student loans discharged in bankruptcy court.  And because of
> the fact that I had  no choice but to prepare and litigate my
> own adversary proceeding, which I have stated several times
> during this proceeding, I also had no choice but to temporarily
> suspend my job seeking activities - mainly the applying for
> specific jobs.

Ex. D-14 at 2.

31.  Although not employed, Mr. Sperazza has for a number of years
participated as a subject in numerous medical studies.  He opined that he earns as much
money by participating in these studies as he is capable of earning in conventional
employment.  N.T. at 2:41.  Before filing his bankruptcy petition, Mr. Sperazza
participated in medical studies so he would not "drain [his] energies on a menial job and
to focus [his] energies on finding appropriate employment."  Ex. D-14 at 3.  After his
bankruptcy filing, he continued to participate in medical studies.

32.  As revealed by 1099 tax forms, Mr. Sperazza earned at least $11,550 in
2004 from participating in these medical studies.  Ex. D-9.  In 2005, he earned at least
$11,075.  Ex. D-7.  And through June 2006, Mr. Sperazza had earned about $6,000 from
participating in medical studies.  N.T. at 4:32; Ex. D-14 at 2.  It is possible that Mr.
Sperazza earned more from these studies than the amounts just noted, as he testified that
he does not receive 1099 tax forms for medical studies that pay him less than $600, and

Mr. Sperazza does not keep financial records beyond the 1099 tax forms that he receives.

N.T. at 4:22.

33.  Mr. Sperazza did not report his compensation from medical studies on

his 1040 tax forms for the years 2004 and 2005, believing this compensation to be non-

taxable.  N.T. at 4:14; Exs. D-3 (answer to interrogatory 16); D-6; D-8.

34.  As of the time of trial in this proceeding, Mr. Sperazza was a physically

healthy individual who was not receiving treatment for any medical condition.  N.T. at

5:06; Ex. D-3 at 13 (answer to interrogatory #11).  He does believe, though, that he has

dyslexia, id. at 11 (answer to interrogatory # 9), but offered no medical evidence of such a

condition.

35.  Upon reviewing his submissions to this court, and observing him in

court, I find that Mr. Sperazza writes reasonably well and clearly, and speaks reasonably

well and clearly, albeit his speech is hesitant at times.  He has performed his own legal

research in this proceeding, citing and quoting decisions he believes are supportive of his

legal position.

36.  Mr. Sperazza believes he has a learning disability that interfered with

his ability to succeed in college, find work, and maintain steady employment.  N.T. at.

3:21, 5:06.  Mr. Sperazza contends that he has had this learning disability for most of his

life.  Ex. D-5 at 16-17.  Mr. Sperazza has not been diagnosed with or treated for any

learning disability, including dyslexia.  Id.; Ex. D-3 at 13 (answer to interrogatory #11).

12

Mr. Sperazza is not receiving disability or social security benefits of any kind.  N.T. 5:05.

37.  Mr. Sperazza was receiving food stamps for a period between 2004 and 2006, which have since been discontinued because the local public welfare agency determined he was able-bodied and not "meeting work requirement."  Ex. D-13.

38.  Since the date of his bankruptcy filing, Mr. Sperazza has made payments to his parents from his medical studies compensation, while recognizing that his prepetition loan obligations to his parents, if any, have been discharged.  N.T. at 4:29; Ex. D-14 at 1.

39.  Mr. Sperazza has not made any voluntary prepetition or postpetition repayments on his student loans, although there have been some involuntary payments made.  N.T. 5:01-02.

40.  Mr. Sperazza appears to be eligible for the William D. Ford Income Contingent Repayment Plan ("ICRP").  N.T. at 3:47.  Under this program, the borrower's payment obligation is recalculated annually based on the borrower's adjusted gross income, the variable interest rate, and other income percentage factors.  34 C.F.R. § 685.209(a)(5).  Mr. Sperazza is aware of the program, and aware that in his current financial situation he may qualify for nominal monthly payments for the balance of this year.  N.T. at 3:47-3:48.  He does not believe that this program, which reviews and computes the student loan obligor's ability to pay for 25 years and can have certain tax consequences, is appropriate.

41.  Based upon his employment history, if Mr. Sperazza has a learning disability such condition does not rise to a level of severity that precludes his employment in a variety of areas: retail; bakery worker; restaurant worker; researcher; and librarian.

42.  Mr. Sperazza is not interested in securing employment he considers repetitious, boring, and low paying.  Exs. D-5 at 61-62; D-14 at 3.  He desires "appropriate employment" which is defined by him as a "well paying, stable job in which I would be qualified for and from which I could . . . [make] my payments on my student loans without jeopardizing a minimal state of living."  Ex. D-14 at 3.

43.  Despite his belief, Mr. Sperazza probably has marketable skills which could assist him in securing employment in the Philadelphia region that would allow him a modest standard of living while allowing him to tender some repayment on his student loans.  Even though Mr. Sperazza testified that he exaggerated some of his duties in his employment history in order to render his resume more impressive, N.T. at 4:00, he has been able to obtain positions in his preferred field and in less remunerative retail settings. Furthermore, he has former colleagues willing to provide references.


II.


I reach the following legal conclusions:

1.  The plaintiff has not met his evidentiary burden of proving that

14

repayment of his student loans would be an undue hardship upon him pursuant to 11

U.S.C. § 523(a)(8).

     2.  The plaintiff has failed to establish all three prongs of the test for undue

hardship adopted by the Third Circuit in In re Faish, 72 F.3d 298 (3d Cir. 1995).


III.


     Plaintiff contends that his student loan debt should be discharged under

section 523(a)(8) because it imposes an undue hardship upon him.  Section 523(a)(8)

states that

> [a] discharge under section 727 . . . does not discharge an
> individual debtor from any debt—
>
> (8) for an educational benefit overpayment or loan made,
> insured or guaranteed by a governmental unit, or made under
> any program funded in whole or in part by a governmental
> unit or nonprofit institution, or for an obligation to repay
> funds received as an educational benefit, scholarship or
> stipend, unless excepting such debt from discharge under this
> paragraph will impose an *undue hardship* on the debtor and
> the debtor's dependants[.]

11 U.S.C. § 523(a)(8) (emphasis added).[3]  Neither party has suggested that plaintiff's

debts to ECMC are anything other than educational loans made, insured or guaranteed by

---

[3] The debtors' bankruptcy case commenced before the effective date of the 2005 changes
to the United States Bankruptcy Code; therefore the pre-Bankruptcy Abuse Prevention and
Consumer Protection Act of 2005 version of 11 U.S.C. § 523(a)(8) applies.

a governmental unit, or made under a program funded in whole or in part by a

governmental unit or non-profit institution.  Thus, the obligations are presumptively

nondischargeable pursuant to 11 U.S.C. § 523(a)(8).  In drafting this exception to

discharge,

> Congress sought principally to protect government entities
> and nonprofit institutions of higher education–places which
> lend money or guarantee loans to individuals for educational
> purposes–[as well as entities who guarantee such loans] from
> bankruptcy discharge.  Because such loans are not based upon
> a borrower's proven credit-worthiness, and because they serve
> a purpose which Congress sought to encourage, section
> 523(a)(8) protects the lender when a borrower, who often
> would not qualify under traditional underwriting standards,
> files a chapter 7 bankruptcy.

In re Segal, 57 F.3d 342, 348 (3d Cir. 1995).

The Third Circuit has adopted the three-prong test for determining "undue

hardship" articulated in Brunner v. New York State Higher Education Services Corp., 831

F.2d 395 (2d Cir. 1987).  In re Faish, 72 F.3d 298 (3d Cir. 1995).  In order to demonstrate

"undue hardship," the chapter 7 debtor must demonstrate:

> (1) that the debtor cannot maintain, based on current income
> and expenses, a "minimal" standard of living for herself and
> her dependents if forced to repay the loans;
>
> (2) that additional circumstances exist indicating that this state
> of affairs is likely to persist for a significant portion of the
> repayment period for student loans; and
>
> (3) that the debtor has made good faith efforts to repay the
> loans.

16

<u>Faish</u>, at 304-305.  The chapter 7 debtor has the burden of proving each prong of the test

by a preponderance of the evidence.  See <u>In re Brightful</u>, 267 F.3d 324, 327-328 (3d Cir.

2001); <u>see generally</u> <u>Grogan v. Garner</u>, 498 U.S. 279, 291 (1991).  If the debtor fails to

prove any prong, the student loans cannot be discharged.  See <u>In re Brightful</u>, 267 F.3d at

327-328.  This three-part test is dispositive: A bankruptcy court may not consider

equitable concerns or other factors not contemplated by the three factors in its "undue

hardship" analysis.  <u>Id.</u>

By way of further explication of these three factors, the Third Circuit in

<u>Faish</u> noted:

> "[t]he first prong of <u>Brunner</u> requires an examination of the
> debtor's current financial condition to see if payment of the
> [student] loans would cause his standard of living to fall
> below that minimally necessary."
> ***
> The second prong of the <u>Brunner</u> test requires "that additional
> circumstances exist indicating that this state of affairs is likely
> to persist for a significant portion of the repayment period of
> the student loans."  <u>Brunner</u>, 831 F.2d at 396. . . .  [T]his
> requirement "properly recognizes the potential continuing
> benefit of an education, and imputes to the meaning of 'undue
> hardship' a requirement that the debtor show his dire financial
> condition is likely to exist for a significant portion of the
> repayment period."
>
> The third prong of the <u>Brunner</u> test is the good faith inquiry. .
> . . [T]he question of good faith should only be reached if the
> debtor has satisfied the first two elements. . . .  The good faith
> inquiry is to be guided by the understanding that "undue
> hardship encompasses a notion that the debtor may not
> willfully or negligently cause his own default, but rather his
> condition must result from 'factors beyond his reasonable

17

control.'"

Id. at 305 (quoting Matter of Roberson, 999 F.2d 1132, 1135 (7th Cir. 1993)) (citations

omitted).

In so defining the phrase "undue hardship" the Court of Appeals intended to

meet the following policy concerns:

> The Brunner standard meets the practical needs of the debtor
> by not requiring that he or she live in abject poverty for up to
> seven years[4] before a student loan may be discharged.  On the
> other hand, the Brunner standard safeguards the financial
> integrity of the student loan program by not permitting
> debtors who have obtained the substantial benefits of an
> education funded by taxpayer dollars to dismiss their
> obligation merely because repayment of the borrowed funds
> would require some major personal and financial sacrifices.

Id. at 305-06.

The parties agree that the sole issue posed by this adversary proceeding is

whether repayment of the debtor's student loans would constitute an "undue hardship,"

utilizing the three-part Faish test.  In general, if Mr. Sperazza were able to repay his

student loans, even though repayment would require from him some "major personal and

financial sacrifices," Congress has required that he do so by rendering his student loan

obligations non-dischargeable.

The undue hardship standard is difficult for an individual debtor to meet.

---

[4]An earlier version of section 523(a)(8) rendered all student loans dischargeable if they
were more than 7 years old at the time of the bankruptcy filing.  That provision was eliminated
by Congress in 1998.  See In re Clarke, 266 B.R. 301, 306 n.6 (Bankr. E.D. Pa. 2001).

For example, in In re Brightful, the Third Circuit concluded that the chapter 7 debtor—a

46-year-old single parent of a 14-year-old minor, who resided with her sister, who was

employed part-time earning about $8,500 per annum at the time of trial, and who also had

psychiatric problems, id. at 326—could repay her outstanding $52,000 student loan

obligation without an undue hardship.

Before considering the three Faish factors, I note that in this adversary

proceeding neither ECMC nor Mr. Sperazza produced evidence at trial of the current

amount of plaintiff's monthly student loan obligation.  This lack of evidence may have

occurred because ECMC has maintained from the inception of the proceeding that Mr.

Sperazza is eligible for the "William D. Ford Federal Direct Loan Program." See 34

C.F.R. Part 685.  Under this program an individual holding certain types of student loans

may consolidate those loans into one direct loan.  See 34 C.F.R. § 685.220; see also In re

Wallace, 259 B.R. 170, 174 (C.D. Cal. 2000).  The borrower may then choose among

different repayment options.  See 34 C.F.R. § 685.208.

The option which ECMC emphasizes in this proceeding is the one styled

the "income contingent repayment plan" or ICRP.  See 34 C.F.R. § 685.208(k).  One

court summarized the salient aspects of this repayment option:

> [A] borrower may qualify for an Income Contingent
> Repayment Plan, where the amount of the required monthly
> payment is recalculated yearly based on the borrower's
> Adjusted Gross Income, family size and the "poverty
> guidelines" promulgated by the United States Department of
> Health and Human Services. The repayment period covers a

19

> maximum of 300 months. The amount of payments are
> dependent on the borrower's income and payment may not be
> required at all during times when the borrower has little
> income. The balance remaining after the 300-month period is
> deemed forgiven.

In re England, 264 B.R. 38, 44 (Bankr. D. Idaho 2001).

To qualify for this income contingent repayment program, an individual

needs to formally apply, which application provides for authorization to the IRS to release

tax information to the Secretary of Education. See In re Thomsen, 234 B.R. 506, 509

(Bankr. D. Mont. 1999). The borrower's monthly payments are then determined based

upon his income, with periodic reviews. See id. Interest on the consolidated loan accrues

at a rate established in the regulations, and if the borrower's payments are insufficient to

cover the accruing interest at least some of it will be capitalized. 34 C.F.R. § 685.209. At

the end of 25 years, the unpaid balance may be "discharged" by the Secretary of

Education, with this discharge considered by the IRS as a taxable event. Thomsen, 234

B.R. at 509-10.

ECMC has argued, even before trial, that were Mr. Sperazza to apply for

the ICRP program he would have little or no payment obligation based upon his present

financial circumstances. This contention, however, may not take into account payments

received from medical studies. And, as noted earlier, Mr. Sperazza has declined to apply

for this program. However, the presence of this issue may have caused both parties to

assume that Mr. Sperazza's present student loan repayment obligation is nominal.

IV.


A.


In order to establish the first prong of the <u>Faish</u> test, a chapter 7 debtor

must show that he cannot maintain, based on current income and expenses, a "minimal"

standard of living for himself and his dependents were he to repay his outstanding student

loans.  <u>Faish</u>, 72 F.3d at 304-05.  This prong requires that the debtor show more than tight

finances.  <u>Id.</u> at 306.  After considering the debtor's basic needs (and those of his

dependents) for food, clothing, shelter, and medical treatment, one must determine

whether the debtor has any additional funds available to make the necessary payments

toward his student loans.  <u>See</u> <u>In re Carlson,</u> 273 B.R. 481, 484 (Bankr. D.S.C. 2001).

At present the debtor has no dependents and is living with his parents.  He

is dissatisfied with that arrangement and intends in the future to establish his own

residence.  However, the present ability to pay factor does not presume that a debtor

cannot maintain a minimal standard of living simply because he is residing with and

receiving support from relatives.  <u>See</u> <u>generally</u> <u>Brightful</u>, 267 F.3d at 328 ("[I]t is also

true that Brightful . . . has no significant housing expenses because she is living in her

sister's home."); <u>see also</u> <u>In re Clarke</u>, 1999 Bankr. Lexis 1842 (Bankr. E.D. Pa. Dec. 10,

1999) (middle-aged debtor not entitled to discharge of student loans although her relatives

21

helped support her).

Mr. Sperazza's parents provide him with the basic necessities, including shelter and food. There is no indication that this arrangement will cease shortly. His current monthly expenses are minimal. On his bankruptcy schedules, Mr. Sperazza listed his monthly expenses as only $125. Ex. D - 2 (Schedule J). This figure includes expenses for debtor's laundry and dry cleaning, transportation, and taxes (and Schedule J suggests that the $25 monthly tax payment would cease when $300 was repaid). Id. If these scheduled expenses were increased to include the debtor's monthly insurance premium for the vehicle he purchased since the date of filing his bankruptcy petition, his monthly expenses would still be less than $200. See Ex. D- 14.

Even though the debtor is not employed, he is paid for his regular participation in medical studies. As of June 2006, debtor earned at least $6,000 participating in these studies; an average of about $1,000/month. This amount is consistent with his earnings in 2004 and 2005. Thus, after Mr. Sperazza's monthly expenses are paid, including the monthly insurance premium, he is left with roughly $800/month. From that amount, he pays some expenses to participate in medical studies and he pays some funds to his parents.

Even after reviewing Mr. Sperazza's bank records offered in evidence, Exs. A-7, A-8, I find it difficult to determine the amount the debtor incurs in unreimbursed expenses to participate in these studies. Not every withdrawal can readily be classified as

a medical study expenditure, and not all payments from medical studies are recorded by

him.  And as for his payments to his parents, to the extent those payments reflect

discharged pre-bankruptcy obligations, see Ex. D-14 at 2 ("I fully intend to pay back my

parents with interest for the times that they have lent me money even though that debt was

discharged."), they are not legally required and would not be taken into account when

determining whether the debtor can maintain a minimal standard of living while making

payments on his student loans.  See In re Cehula, 327 B.R. 241, 247 (Bankr. W.D. Pa.

2005).  In addition, Mr. Sperazza has not budgeted any tax obligation on his medical

studies compensation.

        As a result, the evidentiary record does not clearly reflect his available

monthly income after expenses, nor his monthly obligation on his outstanding student

loans.  Nor can I determine the amount he would be obligated to pay monthly were he to

participate in the ICRP.

        The debtor has the burden of proving that he cannot maintain a minimal

standard of living while making payments on his student loans.  In Faish, the chapter 7

debtor was a 30-year-old state government employee, earning $27,000 per year, with an

11-year-old dependent, who suffered from Crohn's disease and back problems.  Faish, 72

F.3d at 300.  She had been unsuccessful in pursuit of a higher paying job.  Id.

Nonetheless, the Third Circuit held that she failed to prove that she could not maintain a

minimal standard of living for herself and her minor child while repaying her $300

23

monthly loan obligation.

I find it counter-intuitive to accept the plaintiff's implicit contention: that an individual living in the Philadelphia region who has no dependents and earns about $1,000 per month with minimal monthly expenses cannot afford to repay any significant student loan obligations.  Accordingly, Mr. Sperazza has not met his evidentiary burden on the first <u>Faish</u> factor.

B.

Given the paucity of the evidentiary record on the issue of the debtor's present ability to repay his student loans, I consider it appropriate to address the other two <u>Faish</u> factors as well, since the evidentiary record is better developed on those issues.

In addition to demonstrating a present inability to repay one's student loans while maintaining a minimal standard of living, the <u>Faish</u> test requires that the debtor demonstrate that this dire financial condition will persist for a significant portion of the loan repayment period for reasons not within the debtor's control.  <u>See</u> <u>In re Brightful</u>, 267 F.3d at 328.  Dischargeability should be based on "certainty of hopelessness, not simply a present inability to fulfill financial commitment."  <u>Id.</u>  Undue hardship "is reserved for the exceptional case and requires the presence of 'unique' or 'extraordinary' circumstances which would render it unlikely that the debtor ever would be able to honor

24

his obligations." In re Ballard, 60 B.R. 673, 675 (Bankr. W.D. Va. 1986).  The sort of

circumstances that justify a finding of undue hardship under the second prong of the test

are long-term physical or mental problems precluding employment, lack of marketable

job skills, or the necessity of fully supporting several dependents which precludes

sufficient income.  See generally In re Roberson, 999 F.2d 1132, 1137 (7th Cir. 1993)

(and cases cited).

As noted earlier, in In re Brightful, the Third Circuit held that the 46-year-

old part-time legal secretary, raising the 14-year-old child, living with her sister, and who

had psychiatric problems and had twice attempted suicide, did not present sufficient

evidence that she could not obtain full-time secretarial employment in the future and thus

failed to meet the second Faish test.

In this proceeding, Mr. Sperazza is a healthy, 42-year-old individual, with

no dependents.  He is presently unemployed (albeit participating in medical studies)

because he has for some period decided not to seek employment in order to concentrate

on the bankruptcy discharge of his student loans.  He has not demonstrated that he has

made diligent efforts to secure stable employment.  See In re Greco, 251 B.R. 670, 677

(Bankr. E.D. Pa. 2000).  His present employment situation does not exist because he is

unemployable; rather, by his own admission, Mr. Sperazza has not sought employment

since he filed his bankruptcy petition.  Further, it is not clear that debtor's attempts to find

work while still living in Washington, D.C. were exhaustive, as he was participating in

25

medical studies so that he did not have to engage in "menial" employment.

Plaintiff contends that moving from Washington, D.C. to Pennsylvania after being evicted from his apartment in August 2005 is clear evidence of undue hardship. However, the second prong of the <u>Faish</u> test focuses upon the future, not simply the past or present circumstance; it also contemplates that plaintiff may have to relocate when feasible to do so in order to be near supportive family members and new employment opportunities. See <u>In re Zierden-Landmesser</u>, 249 B.R. 65, 70 (M.D. Pa. 2000).

Having relocated from Washington, D.C. to Levittown, Pennsylvania, Mr. Sperazza may avail himself of different employment opportunities from those existing in the Washington, D.C. market. Additionally, if positions in the library science or information management fields prove unavailable here, plaintiff should seek employment opportunities in other fields. See <u>Greco</u>, 251 B.R. at 677; <u>In re Vinci</u>, 232 B.R. 644, 652-53 (Bankr. E.D. Pa. 1999) ("Borrowers under the various guaranteed student loan programs are obligated to repay their loans even if they are unable to obtain employment in their chosen field of study."). There is no evidence in the record that plaintiff has diligently been seeking employment outside of his preferred fields before or after he relocated from Washington, D.C.

Again, Mr. Sperazza is a healthy, able-bodied man in his early forties without any dependents. He has an Associate of Arts Degree in American Studies. While he claims to have a learning disability, debtor did not produce evidence of a quantum

sufficient to convince this court that such a condition would preclude him from future employment.  "Although [corroborating] evidence does not have to necessarily consist of extensive expert testimony, such evidence should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position."  In re Johnson, 299 B.R. 676, 681 (Bankr. M.D. Ga. 2003) (quoting In re Swinney, 266 B.R. 800, 805 (Bankr. N.D. Ohio 2001)); see In re Brightful, 267 F.3d at 330 (debtor failed to prove that her psychological problems were disabling).  For example, a debtor may use medical records to substantiate a claim that he is disabled.  See In re Hoskins, 292 B.R. 883, 888 (Bankr. C.D. Ill. 2003).

Here the debtor produced no evidence, beyond his own testimony, that he has a learning disability.  He has never been diagnosed with or treated for a learning disability.  Further, the plaintiff has not demonstrated how a learning disability prevents him from obtaining and keeping full time employment, or that it was likely to do so in the future.[5]  In order to satisfy the second prong of the Faish test, a debtor must demonstrate not only the existence of some medical or psychological condition, but that this condition would adversely affect his ability to work and make future payments on his loans.  See In

---

[5] The website http://www.dyslexiaonline.com/famous/famous.htm alleges that the following successful individuals were dyslexics: Pablo Picasso, Tom Cruise, Richard Branson, Thomas Edison, Jay Leno, Whoopi Goldberg, and Leonardo Da Vinci.  Another website, http://www.lesblind.is/successfuldyslexics/successfuldyslexics.cfm, adds Albert Einstein, John Lennon and others to the list of purported dyslexics who had successful careers.  If these allegations are true, then it would appear that dyslexia would not be disabling.

re Brightful, 267 F.3d at 330.

In this adversary proceeding, Mr. Sperazza has failed to offer persuasive evidence that he has a disability, that this disability renders him unable to be gainfully employed, and that his current unemployed circumstances are beyond his control.  He has no corroborating medical records, he is not being treated for any condition, he has not diligently sought employment for some time, and he has the intellectual ability to represent himself in this proceeding and to find and participate in numerous medical studies.  Furthermore, his employment history, outlined in the factual findings, does not support his contention that he is incapable of finding and keeping a job.

Accordingly, Mr. Sperazza has failed to meet his evidentiary burden on the second prong of the Faish standard for undue hardship.

## C.

The third prong of the Faish test requires that the debtor demonstrate that he has made good faith efforts to repay his student loans.  Faish, 72 F.3d at 305. Fundamental to the good faith inquiry is the notion that the debtor did not willfully or negligently cause his own default, but that his condition results from factors beyond his control.  Id.  A debtor's good faith may be measured by his efforts to obtain employment, maximize income, and minimize expenses.  In re Mason, 464 F.3d 878, 884 (9th Cir.

2006).  In making this determination, the Third Circuit has noted two non-exclusive

factors bankruptcy courts should consider: "(1) whether the debtor incurred substantial

expenses beyond those required to pay for basic necessities and (2) whether the debtor

made efforts to restructure his loan before filing his petition in bankruptcy."  Pelliccia v.

U.S. Dep't of Educ., 67 Fed. Appx. 88, 91 (3d Cir. 2003) (non-precedential decision); see

also In re Pena, 155 F.3d 1108, 1114 (9th Cir. 1998) (debtors acted in good faith where

(1) they made some payments on their loans and (2) although they purchased a car, it was

a 20-year-old car); In re Cheesman, 25 F.3d 356, 360 (6th Cir. 1994) (debtors acted in

good faith where (1) they made minimal payments on their loans for several years and (2)

chose to work in worthwhile professions even though they were low-paying); Brunner,

831 F.2d at 397 (debtor failed to demonstrate good faith when she filed a bankruptcy

petition shortly after her student loan payments first became due, and never requested a

payment deferment).

    In the instant matter, the debtor has not incurred any substantial

expenses beyond those required to pay for basic necessities.  He purchased a van since the

date of his bankruptcy filing; however, the vehicle was about 15 years old and only cost

him $400.  While the debtor incurs occassional expenses to travel to and from medical

studies, he is paid for his participation in those studies.  Though the debtor's primary

living expenses are paid for by his parents, and while the evidence reflects that he

occasionally eats in restaurants and buys certain entertainment type items, it cannot be

said that he leads a spendthrift lifestyle.

While I can accept that Mr. Sperazza has sufficiently minimized his

monthly expenses, he has failed to conscientiously strive to maximize his income.  As of

this date the debtor is unemployed; he has not sought work since filing his bankruptcy

petition in 2005.  He has chosen not to seek employment in order to concentrate his

efforts on his attempt to discharge his student loan debts.  Moreover, his efforts to find

work after leaving ASRC seem cursory, as he apparently preferred participating in

medical studies so that he did not have to engage in "menial" employment.  When a

debtor has not actively sought employment for a substantial period and is not precluded

from doing so by reasons of health or other circumstances, it is difficult for that debtor to

demonstrate the requisite good faith effort to repay his student loans as required by the

third prong of the <u>Faish</u> test.  <u>See</u> <u>Mason</u>, 464 F.3d at 885.

Although not dispositive, I also note that Mr. Sperazza declined any effort

to  restructure his loans before seeking to have them discharged in bankruptcy.

Defendant ECMC contends that because the debtor would be eligible for the ICRP, and

because his monthly payments would be nominal, debtor cannot demonstrate the requisite

good faith required by the third prong of the <u>Faish</u> test.

Of course, this argument was made before ECMC learned of the present

debtor's medical-studies compensation.  Furthermore, the ICRP is but one factor to be

considered in determining undue hardship; participation in the program is not a

prerequisite to dischargeability under section 523(a)(8).  See, e.g., In re Durrani, 311 B.R.

496, 506 (Bankr. N.D. Ill. 2004); In re Furrow, 2004 WL 2238536 (Bankr. W.D. Mo.

2004); In re Strand, 298 B.R. 367, 376 (Bankr. D. Minn. 2003); In re Newman, 304 B.R.

188, 195 (Bankr. E.D. Pa. 2002); see generally In re Ford, 269 B.R. 673, 677 (B.A.P. 8th

Cir. 2001).    However, based upon the evidence presented, Mr. Sperazza does not

dispute that it is likely that he would qualify for the ICRP and thus could have a

repayment plan tailored to his present financial circumstances.

        The debtor deferred his loans payments while attending the University of

Maryland and while he was unemployed in 1995 and 1996.  Moreover, the debtor has

made no voluntary loan repayments; apparently the only payments made on his loans

came from monies due from a tax rebate plus a National Institute of Health medical study,

both of which were seized by the government and applied to his student loan debt.  As

with the ICRP, the existence of only involuntary loan payments does not mandate a

finding that the debtor has failed to exhibit good faith in repaying his student loans.  See

In re Naylor, 348 B.R. 680, 682 (Bankr. W.D. Pa. 2006).  Nonetheless, both are relevant

to the issue, as are his voluntary payments into a retirement program while not tendering

student loan payments.

        Considering all of the evidence, I conclude that Mr. Sperazza failed to meet

his evidentiary burden on the issue of good faith.  The evidence reveals that he never

made any loan repayments while employed and earning more than $20,000 per year.  Mr.

Sperazza's income ranged between $20,000 and $32,000 between 2001-2003.  At no time

during this period did the debtor make any voluntary payments on his student loans.  The

debtor had income sufficient to do so, as he tendered voluntary contributions to a 401(k)

plan during that time.

Furthermore, he has repaid his parents rather than his student loans with his

earnings from his medical studies participation.  Indeed, Mr. Sperazza intends to continue

to tender payments to his parents, despite the fact that any pre-bankruptcy parental loans

have been discharged in bankruptcy.  He has not made any such payments to his student

loan obligees, nor is that his intent.  Moreover, he has failed to seek employment in a

diligent manner or participate in the ICRP, while devoting all of his recent efforts to

attempting to discharge his student loans in his bankruptcy case.

These conscious actions on the part of the plaintiff reflect that his failure to

make student loan payments were not due to circumstances beyond his control, and

therefore do not represent "good faith" on his part, as required by section 523(a)(8).


VII.


In summary, after considering the testimony and all of the evidence as well

as the briefs filed by the parties after trial, I conclude that the plaintiff has not

demonstrated by a preponderance of the evidence that repaying his student loans imposes

32

an undue hardship upon him pursuant to 11 U.S.C. § 523(a)(8).  Plaintiff has failed to

meet the three prong test for undue hardship adopted by the Third Circuit in <u>In re Faish</u>,

72 F.3d 298 (3d Cir. 1995) .

　　　　An appropriate order shall be entered.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| JEFFREY J. SPERAZZA | : | |
| Debtor | : | Bankruptcy No. 05-36416bif |

_____

| | | |
|---|---|---|
| JEFFREY J. SPERAZZA, | : | |
| Plaintiff | : | |
| v. | : | |
| EDUCATION CREDIT | : | |
| MANAGEMENT CORPORATION and | | |
| UNIVERSITY OF MARYLAND | : | |
| Defendants | | Adversary No. 06-82 |

_____

.................................................

ORDER

.................................................

AND NOW this 22nd day of January 2007, for the reasons stated in the

accompanying opinion, it is hereby ordered that judgment is entered in favor of

defendant ECMC and against plaintiff Jeffrey Sperazza.

The student loan obligations held by defendant ECMC are not

dischargeable pursuant to 11 U.S.C. § 523(a)(8) because repayment by the plaintiff would

not constitute an undue hardship.

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

Mr. Jeffrey J. Sperazza
88 Vermillion Drive
Levittown, PA 19054

John P. Neblett, Esquire
2000 Linglestown Road, Suite 204
Harrisburg, PA 17110